## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JON CASCELLA,

           Plaintiff,

    v.

UNITED STATES OF AMERICA,

           Defendant.

No. 4:21-CV-01490

(Chief Judge Brann)

## MEMORANDUM OPINION

### FEBRUARY 9, 2024

Plaintiff Jon Cascella filed the instant lawsuit under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-80.  He alleges negligence by several Federal Bureau of Prisons (BOP) officials during his incarceration at LSCI Allenwood in White Deer, Pennsylvania.  Presently pending is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons that follow, the Court will dismiss Cascella's first two FTCA claims for lack of subject matter jurisdiction and will grant Defendant's motion for summary judgment as to Cascella's third and final FTCA claim.

# I.     FACTUAL BACKGROUND[1]

Cascella suffers from serious mental health issues, including a history of suicidal "gestures/attempts."[2]  In his complaint, he alleged that on February 4, 2020, while he was on suicide watch, Christine Schmidt, PhD, negligently gave him a "sharp pencil" that he used to cut his left arm.[3]  He additionally asserted that Dr. Schmidt negligently removed him from suicide watch on February 18, 2020, and placed him in the special housing unit (SHU) in a "high risk situation," which allowed him to acquire a razor blade.[4]  Then, on March 12, 2020, he used that razor blade to cut himself five times.[5]  After being treated by medical staff, Cascella alleges that Lieutenant Justin Foura negligently shackled his legs too tightly,

---

[1]   Local Rule of Court 56.1 requires that a motion for summary judgment be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  *Id.*  "Statements of material facts in support of, or in opposition to, a motion [for summary judgment] shall include references to the parts of the record that support the statements."  *Id.*  The United States filed a lengthy and properly supported statement of material facts.  *See* Doc. 152.  Cascella responded to this statement as part of his brief in opposition to Defendant's Rule 56 motion.  *See* Doc. 162 at 19-30.  Many of Cascella's denials, however, are not supported by citations to the record and instead contain nothing more than argument or opinion.  This directly contravenes Local Rule 56.1.  *See Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613 (3d Cir. 2018) (explaining that Local Rule 56.1 "is essential to the Court's resolution of a summary judgment motion due to its role in organizing the evidence, identifying undisputed facts*, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence*." (emphasis supplied) (internal quotation marks and citations omitted)).  Defendant's statements of material facts, therefore, are deemed admitted unless properly countered by Cascella with citations to admissible record evidence.  *See* LOCAL RULE OF COURT 56.1.

[2]   *See* Doc. 152 ¶¶ 1-2.
[3]   Doc. 1 ¶ 5(a).
[4]   *Id.* ¶ 5(c).
[5]   *Id.* ¶ 5(d).

causing "4 deep lacerations" by the leg restraints in both of his legs.[6]

Cascella pursued these FTCA claims through the administrative system.[7] On July 31, 2021, the BOP denied his administrative claims and issued him a right-to-sue letter.[8]  Cascella timely filed suit in this Court the following month, alleging negligence by BOP officials.[9]  Defendant, the United States, now moves for summary judgment on all remaining FTCA claims.[10]  That motion is fully briefed and ripe for disposition.

## II.    STANDARD OF REVIEW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."[11]  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[12]  Material facts are those "that could alter the outcome" of the litigation, and "disputes are

---

[6]   *Id.*  Cascella also alleged that on February 18, 2020, a nurse gave him a syringe while he was in the "suicide cell," in violation of BOP policy and procedure.  *Id.* ¶ 5(b).  However, during his deposition, he admitted that the syringe was given to him for insulin administration and that he did not suffer any bodily injury from this incident.  *See* Doc. 152 ¶¶ 18-20.  Accordingly, Cascella concedes that any FTCA claim related to this incident should be withdrawn.  *See id.* ¶ 21; Doc. 162 at 21 ¶ 21.

[7]   *See* Doc. 89-1 at 3-12; Doc. 90.

[8]   Doc. 1-2 at 2.

[9]   *See generally* Doc. 1.

[10]   Doc. 140.

[11]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

[12]   Fed. R. Civ. P. 56(a).

'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[13]

At the Rule 56 stage, the Court's function is not to "weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial."[14]  The Court must view the facts and evidence presented "in the light most favorable to the non-moving party" and must "draw all reasonable inferences in that party's favor."[15]  This evidence, however, must be adequate—as a matter of law—to sustain a judgment in favor of the nonmoving party on the claim or claims at issue.[16]  A "scintilla of evidence" supporting the nonmovant's position is insufficient; "there must be evidence on which the jury could reasonably find for the [nonmovant]."[17]  Succinctly stated, summary judgment is "put up or shut up time" for the nonmoving party.[18]

## III.   DISCUSSION

Defendants challenge each of Cascella's FTCA claims.  They first contend that the discretionary function exception bars Cascella's negligence claims.  They

---

[13]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (*quoting Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

[14]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[15]   *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014).

[16]   *Liberty Lobby*, 477 U.S. at 250-57; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-89 (1986).

[17]   *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 252) (alteration in original).

[18]   *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 391 (3d Cir. 2017) (quoting *Berkeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)).

further maintain that, even if the discretionary function exception does not preclude Cascella's claims, he has failed to proffer sufficient evidence to establish *prima facie* claims of negligence with respect to his removal from suicide watch and the tightening of his leg restraints.  After thorough consideration, the Court finds that none of Cascella's claims can survive Rule 56 scrutiny.

### A.   FTCA and the Discretionary Function Exception

"The FTCA offers a limited waiver of the federal government's sovereign immunity from civil liability for negligent acts of government employees acting within the scope of their employment."[19]  "[T]he FTCA does not itself create a substantive cause of action against the United States; rather, it provides a mechanism for bringing a state law tort action against the federal government in federal court.  Thus, 'the extent of the United States' liability under the FTCA is generally determined by reference to state law.'"[20]

There is, however, a significant limitation on FTCA liability, often referred to as the "discretionary function exception."[21]  The discretionary function exception to the FTCA eliminates jurisdiction "for claims based upon the exercise of a discretionary function on the part of any employee of the government."[22]  The

---

[19]   *Rinaldi v. United States*, 904 F.3d 257, 273 (3d Cir. 2018); *see also* 28 U.S.C. § 1346(b)(1).

[20]   *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 264 F.3d 344, 361-62 (3d Cir. 2001) (quoting *Reo v. U.S. Postal Serv.*, 98 F.3d 73, 75 (3d Cir. 1996)).

[21]   *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 332 (3d Cir. 2012); 28 U.S.C. § 2680(a).

[22]   *Baer v. United States*, 722 F.3d 168, 172 (3d Cir. 2013) (citing 28 U.S.C. § 2680(a)).

exception "marks the boundary between Congress'[s] willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."[23]  The exception applies to discretionary actions "whether or not the discretion involved be abused."[24]  The government bears the burden of establishing that the discretionary function exception applies.[25]

When faced with a discretionary function challenge by the government, the Court must first identify the conduct at issue in the FTCA claim.[26]  Once the conduct is identified, the court performs a two-step inquiry to determine if the discretionary function exception immunizes the government from an FTCA claim arising out of that conduct.[27]

First, the court considers whether the conduct at issue "is a matter of choice for the acting employee" because "conduct cannot be discretionary unless it involves an element of judgment or choice."[28]  If a federal statute, regulation, or policy dictates a course of action for a federal employee to follow, the

---

[23]  *S.R.P. ex rel. Abunabba*, 676 F.3d at 332 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984)).

[24]  28 U.S.C. § 2680(a); *Merando v. United States*, 517 F.3d 160, 167 (3d Cir. 2008).

[25]  *S.R.P. ex rel. Abunabba*, 676 F.3d at 333 (citation omitted).

[26]  *See id.* at 332.

[27]  *Id.* at 332-33.

[28]  *Baer*, 722 F.3d at 172.

discretionary function exception cannot apply because "the employee has no rightful option but to adhere to the directive."[29]

If, on the other hand, a specific course of conduct is not prescribed for the employee, the court proceeds to the second step.[30]  At step two, because the challenged conduct involves an element of judgment or choice, the court must determine "whether that judgment is of the kind that the discretionary function exception was designed to shield."[31]  That is because the exception "protects only governmental actions and decisions based on considerations of public policy."[32] The focus of this inquiry is not on the employee's subjective intent in exercising discretion but "on the nature of the actions taken and . . . whether they are susceptible to policy analysis."[33]  As the Supreme Court has explained, "[t]here are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish."[34]  However, "if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same

---

[29]   *S.R.P. ex rel. Abunabba*, 676 F.3d at 333 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).
[30]   *Id.*
[31]   *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991).
[32]   *Id.* at 323 (quoting *Berkovitz*, 486 U.S. at 537).
[33]   *Id.* at 325.
[34]   *Id.* at 325 n.7.

policies which led to the promulgation of the regulations."[35]

**B.    February 4, 2020 Incident**

Cascella first alleges that Dr. Schmidt was negligent by providing him with a pencil, purportedly in contravention of BOP policy, while he was on suicide watch. The undisputed facts reflect that on February 4, 2020, Dr. Schmidt gave Cascella a small "golf" pencil and his reading glasses so that he could complete the Minnesota Multiphasic Personality Inventory-2, which would allow Dr. Schmidt to better assess Cascella's current psychological state.[36]  Pursuant to BOP Program Statement P5324.08 § 12(c)(2), Dr. Schmidt advised Cascella's inmate companion—who was present to monitor Cascella's behavior while on suicide watch—to contact staff if Cascella used the pencil to threaten or engage in self-harm.[37]

About 20 minutes later, Dr. Schmidt was notified that Cascella had threatened to commit self-harm with the small pencil, prompting the inmate companion to notify staff.[38]  Cascella's medical records do not establish that he did anything more than threaten to use the pencil for self-harm by holding it to his wrist.[39]  Cascella alleges in his complaint that he "cut" his left arm with the

---

[35]  *Baer*, 722 F.3d at 172-73 (quoting *Gaubert*, 499 U.S. at 324).
[36]  Doc. 152 ¶¶ 5-6, 8.
[37]  *Id.* ¶ 9.
[38]  *Id.* ¶ 10; Doc. 152-3 at 2.
[39]  *See* Doc. 152-3 at 2.

pencil,[40] but he has not provided any evidence to substantiate this allegation. At best, Cascella points to suicide observation logs (written by nonmedical "inmate companions") that indicate that he used the pencil to "poke" and "scratch" his arm.[41] It does not appear that medical attention was sought for any physical injury.

The United States argues that BOP policy provides discretion for designated psychologists like Dr. Schmidt to determine what type of personal property to provide to inmates on suicide watch, and therefore the discretionary function exception bars this claim. The Court agrees.

Step one of the discretionary function analysis asks whether the conduct at issue is a matter of choice for the federal employee. Here, whether to give Cascella a small golf pencil and reading glasses to fill out a psychological questionnaire as part of his mental health treatment clearly involved an "element of judgment or choice."[42] Cascella has not pointed to any statute, regulation, or policy that would mandate what specific objects can or cannot be given to inmates on suicide watch, much less objects that are used as part of psychological treatment.[43] That decision, therefore, was left to Dr. Schmidt's sound discretion.

---

[40]   Doc. 1 ¶ 5(a).

[41]   *See* Doc. 162 at 4 (citing Doc. 1-3 at 3-5)).

[42]   *Baer*, 722 F.3d at 172 (citation omitted).

[43]   During his deposition, Cascella argued that page 12 of BOP Program Statement P5324.08 (which appears to be Section 12(b)), did not include in its list of "personal property, bedding, clothing, magazines" a pencil or glasses or "trauma objects," and thus the policy prohibited Dr. Schmidt from giving him a pencil. *See* Doc. 152-16 at 2-3; *see also* Doc. 152-18 at 2-3. Cascella is incorrect. Section 12(b) does not provide an exhaustive list of what objects can or cannot be given to an inmate on suicide watch. Rather, it states that the Program Coordinator

The second step of the discretionary function analysis asks whether the governmental action or decision is based on considerations of public policy. Again, the answer here is a resounding "yes." Permitting prison doctors—who have frequent contact with their prisoner-patients and are in the best position to make treatment decisions—to have discretion regarding how their patients are treated, tested, housed, and managed is based on policy considerations like prison healthcare management as well as the safekeeping of inmates who are particularly vulnerable to the risk of suicide.

Moreover, "if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations."[44] Here, BOP Program Statement P5324.08 § 12(b) explicitly provides that the Program Coordinator or designee "will specify the type of *personal property*, bedding, clothing, magazines, that may be allowed" for an inmate on suicide watch.[45] Thus, there is a "strong presumption" that the discretionary act of permitting Cascella to have a small golf pencil to fill out a psychological questionnaire "involves consideration of the same policies which led

---

or designee (*i.e.*, Dr. Schmidt) will decide what items covered by that list are allowed to be given to an inmate on suicide watch. Furthermore, a small golf pencil logically can be considered a type of "personal property."

[44] *Baer*, 722 F.3d at 172-73 (quoting *Gaubert*, 499 U.S. at 324).

[45] *See* Doc. 152 ¶ 15; Doc. 152-15 at 13 (emphasis supplied).

to the promulgation of the regulations."[46]

In sum, the discretionary function exception applies to Cascella's first FTCA claim regarding the events of February 4, 2020. The Court thus lacks subject matter jurisdiction to entertain this claim and it must be dismissed.[47] [48]

### C.    February 18, 2020 Removal from Suicide Watch

Cascella next alleges that Dr. Schmidt was negligent by removing him from suicide watch in a suicide cell and returning him to the SHU on February 18, 2020, because this decision purportedly enabled him to acquire a razor blade and cut himself on March 12, 2020. This claim fails for at least two reasons.

First, the Court lacks subject matter jurisdiction for this claim because the discretionary function exception applies. The analysis here is similar to the discretionary function analysis for Cascella's first FTCA claim. Cascella has not identified a statute, regulation, or policy that dictates when a treating physician like Dr. Schmidt can remove a prisoner-patient from suicide watch. In fact, Cascella does not address Defendant's discretionary function argument for this claim at

---

[46]  *Baer*, 722 F.3d at 172-73 (quoting *Gaubert*, 499 U.S. at 324).

[47]  *See Merando v. United States*, 517 F.3d 160, 175 (3d Cir. 2008).

[48]  Assuming the Court had jurisdiction to consider this FTCA claim, it would fail for a separate reason. Even when viewing the facts in a light most favorable to Cascella, the only physical injury he sustained on February 4 was a scratch or scratches to his wrist. This type of minor physical injury does not rise above the *de minimis* level as required for a prisoner FTCA claim seeking damages for emotional or mental injury. *See* 28 U.S.C. § 1346(b)(2); 42 U.S.C. § 1997e(e); *Mitchell v. Horn*, 318 F.3d 523, 536 (3d Cir. 2003); *West v. United States*, 729 F. App'x 145, 148 (3d Cir. 2018) (nonprecedential) (citing *Mitchell*, 318 F.3d at 536).

all.[49]  Dr. Schmidt's decision regarding when to remove Cascella from suicide watch, accordingly, was well within her discretion as a treating physician.

And, like Cascella's first claim, this is the type of decision that is meant to be shielded from liability by the discretionary function exception.  As noted above, allowing medical professionals—who have frequent contact with their prisoner-patients and are in the best position to make critical treatment decisions—to have discretion regarding how their patients are managed and where they are housed is based on policy considerations of prison healthcare management as well as the safekeeping of inmates who are particularly vulnerable to suicide.

Additionally, BOP Program Statement P5324.08 provides wide latitude for psychologists treating inmates who participate in self-injurious behavior or express suicidal intent.  Section 11 of Program Statement P5324.08 states that the Program Coordinator or designee (*i.e.*, Dr. Schmidt) will determine the appropriate type of intervention for inmates who present a potential for suicide, like "heightened staff or inmate interaction, a room/cell change, greater observation, placement in restraints, or referral for psychotropic medication."[50]  Placement on suicide watch in a suicide observation cell, therefore, is one of many potential treatment options for inmates who present a heightened risk for suicide.

---

[49]  *See generally* Doc. 162.
[50]  Doc. 152-15 at 11-12.

And when the psychologist determines, based on "clinical findings," that a suicide crisis is over, they will either remove the prisoner from suicide watch or—if warranted in their professional judgment—"arrange for the inmate's transfer to a medical referral center or contract health care facility."[51]  These policies expressly incorporate discretion for the treating physician, and thus "the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations."[52]  Furthermore, when a prisoner (like Cascella) is placed on suicide watch while housed in the SHU, BOP policy mandates that "once the crisis is over, the inmate will be returned to the SHU to satisfy any sanction that was imposed."[53]

Consequently, the discretionary function exception applies to Dr. Schmidt's February 18 decision, based on her clinical findings, to remove Cascella from suicide watch and return him to the SHU.  The Court, therefore, lacks subject matter jurisdiction to entertain this FTCA claim.

Even assuming for the sake of argument that the Court had jurisdiction to adjudicate this claim, it fails on the merits.  The United States has proffered extensive evidence regarding the appropriateness of Dr. Schmidt's clinical decision

---

[51]  *Id.* at 14.
[52]  *Baer*, 722 F.3d at 172-73 (quoting *Gaubert*, 499 U.S. at 324).
[53]  Doc. 152-15 at 8 (BOP Program Statement P5324.08 § 9(c)(3)(E)).

13

to remove Cascella from suicide watch and place him on an individualized four-week Suicide Risk Management Plan (SRMP), which is utilized when "an inmate's self-harm behaviors place him at risk of serious harm or death and the inmate consistently refuses to engage in collaborative treatments."[54] An SRMP "is an attempt to shape the environment around the inmate in ways that discourage self-harm and encourage healthy replacement behaviors."[55] Dr. Schmidt determined that a transfer from suicide watch to an SRMP was necessary "because crisis-driven contacts associated with suicide watch were inadvertently making the intervention therapeutically counter-productive and were reinforcing Cascella's maladaptive patterns of thought and behavior of using threats of self-harm to manipulate his conditions of confinement."[56]

Cascella has failed to rebut this medical evidence with any evidence of his own. Instead, he simply contends that "Dr. Schmidt's [d]iagnosis was wrong" because he eventually committed self-harm almost a month later.[57] This type of conclusory allegation and layperson opinion is insufficient to meet Cascella's burden at summary judgment.[58] As this Court has already indicated, Cascella's

---

[54] Doc. 152 ¶ 27.

[55] *Id.* ¶ 28.

[56] *Id.* ¶ 29.

[57] Doc. 162 at 22 ¶ 29.

[58] *See Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288-89 (3d Cir. 2018) (explaining that "the non-moving party . . . may not rest upon the mere allegations or denials of his pleadings but, instead, must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice." (alteration omitted) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268-69 (3d Cir. 2014))).

claim regarding Dr. Schmidt's decision to remove him from suicide watch and place him on an SRMP is one that "implicates medical judgment," a critical dividing line between run-of-the-mill negligence claims and medical malpractice.[59] Merely asserting that Dr. Schmidt's treatment decision was "wrong" or had a poor outcome falls far short of creating a genuine dispute of fact regarding whether Dr. Schmidt breached her duty of care by deviating from an acceptable professional standard.  It likewise fails to establish causation.[60]

In no way does this claim meet the "very narrow exception" to the requirement of expert testimony known as "*res ipsa loquitur*," whereby a plaintiff can pursue a medical malpractice claim without expert evidence because "common knowledge makes apparent" the claim's merit.[61]  Rather, determining whether Dr. Schmidt's clinical decision to remove Cascella from suicide watch and place him on an SRMP (1) fell below the "requisite degree of care and skill" ordinarily possessed "by members of the medical profession," and (2) proximately caused Cascella's subsequent harm requires expert evidence that Cascella has failed to proffer.[62]

---

[59]  *See* Doc. 84 at 8; *Iwanejko v. Cohen & Grigsby, P.C.*, 249 F. App'x 938, 944 (3d Cir. 2007) (nonprecedential) (explaining that a "critical feature" of a medical malpractice action is that it "turns on 'questions involving medical judgment'" (quoting *Ditch v. Waynesboro Hosp.*, 917 A.2d 317, 322 (Pa. Super. Ct. 2007))).

[60]  *See Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003) (setting forth elements for medical malpractice claim under Pennsylvania law).

[61]  *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 580 (3d Cir. 2003); *Toogood*, 824 A.2d at 1145-50 (explaining doctrine of *res ipsa loquitur* as applied to medical malpractice claims).

[62]  *See Toogood*, 824 A.2d at 1145, 1150.

It matters not that Cascella maintains that he is asserting only a simple negligence claim against Dr. Schmidt.[63]  His attempt "to recast his cause of action as something other than a medical malpractice claim to avoid the requirement of expert medical testimony" in unavailing.[64]  Without any expert evidence of the standard of care, breach, or causation, this medical malpractice claim cannot survive Rule 56 scrutiny.

One final observation is necessary.  The determination that Cascella has failed to present expert evidence of medical negligence is *not* based on Cascella being bound by his prior submission of a certificate of merit under Pennsylvania Rule of Civil Procedure 1042.3(a)(3), in which he asserted that "expert testimony of an appropriate licensed professional is unnecessary for prosecution" of his claim.[65]  The United States Court of Appeals for the Third Circuit has recently held in *Wilson v. United States*[66] that "Rule 1042.3's certificate of merit requirement does not apply in FTCA cases."[67]

Contrary to the facts underlying *Wilson v. United States*, Cascella has been given ample time for discovery and has still failed to adduce or present any evidence—expert or otherwise—of medical malpractice.  Additionally, the holding

---

[63] *See* Doc. 152-18 at 2 (claiming (incorrectly) during deposition that "all my claims are negligent [sic], simple negligence claims . . . .  You try to do it as malpractice.  We knocked that out of the water.").

[64] *See Toogood*, 824 A.2d at 1150.

[65] *See* Doc. 36.

[66] 79 F.4th 312 (3d Cir. 2023).

[67] *Id.* at 316.

16

in *Wilson v. United States* does not affect the determination that the instant claim against Dr. Schmidt sounds in professional malpractice rather than simple negligence, or that expert evidence is required to establish the standard of care, breach, and proximate causation. That substantive state law remains controlling for FTCA claims, as the *Wilson* panel noted.[68]

### D.    March 12, 2020 Leg Restraint Incident

Cascella's final FTCA claim alleges that, on March 12, 2020, Lieutenant Foura was negligent by applying leg restraints too tightly and causing injury to Cascella's legs. Cascella, however, has failed to provide evidence to support the elements of his *prima facie* negligence claim and therefore summary judgment must be granted in Defendant's favor.

The undisputed facts establish that, on March 12, 2020, Cascella became agitated when he was ordered to submit to restraints so that he could be moved from LSCI Allenwood to a medium security facility.[69] In lock-step with Dr. Schmidt's prior clinical observations that Cascella frequently utilized self-harm (or threats of self-harm) to manipulate his conditions of confinement,[70] Cascella began cutting his left wrist with a razor blade he acquired sometime after he had returned to the SHU.[71] Cascella refused to drop the razor blade when ordered by staff, so

---

[68]  *See id.* at 317.
[69]  Doc. 152 ¶ 59.
[70]  *See id.* ¶¶ 27, 29, 34, 36, 38, 40.
[71]  *Id.* ¶ 59.

chemical agents were deployed to get Cascella to stop his self-injurious conduct.[72]

Cascella eventually complied with staff orders and was removed from his cell and

taken to Health Services for medical treatment.[73]  After receiving medical care for

the lacerations on his wrist, and due to his self-injurious behavior and continued

threats of self-harm, Cascella was placed into hard ambulatory restraints around

9:30 a.m.[74]

Cascella remained in those restraints until 2:00 p.m., approximately four and

a half hours.[75]  During this time, BOP staff performed all restraint checks required

by policy, including the initial health assessment, 15-minute restraint checks, and

two-hour interval checks by lieutenants.[76]  While restrained, Cascella was

documented as being verbally abusive, shouting obscenities, threatening prison

staff, refusing his lunch, screaming at the wall, and kicking the cell door.[77]  He was

also noted at various times to be laying or sitting on his bed, standing against the

wall, and using the toilet.[78]  During the final lieutenant interval check at 2:00 p.m.,

Lieutenant Victor Castrati determined that Cascella had regained self-control and

appeared compliant, so he discontinued the ambulatory restraints.[79]

---

[72]   *Id.* ¶ 60.

[73]   *Id.* ¶¶ 61-62.

[74]   *Id.* ¶ 63.

[75]   *Id.* ¶ 76.

[76]   *Id.* ¶¶ 76, 77, 78-82; Doc. 152-25 at 2; Doc. 152-26 at 2-3; Doc. 152-27 at 2-3.

[77]   Doc. 152 ¶ 77.  Although Cascella denies refusing his lunch or kicking the cell door, (Doc. 162 at 28 ¶ 77), he does not support his denials with citations to record evidence, (*see id.*).

[78]   Doc. 152 ¶ 77.

[79]   *Id.* ¶ 82.

The United States first argues that Cascella's claim that his leg restraints were secured too tightly is barred by the discretionary function exception. The Court disagrees.

The governing regulation, 28 C.F.R. § 552.22, provides that restraint equipment or devices—like the ambulatory restraints employed in the instant case—"may not be used . . . [i]n a manner that causes unnecessary physical pain or extreme discomfort."[80] The corresponding BOP policy, Program Statement P5566.06, further elaborates, "Although the proper application of restraints may result in some discomfort, prohibited uses of restraints include, but are not limited to: "hogtying[,]" unnecessarily [sic] tightness, or improperly applied restraints."[81] Consequently, applying ambulatory restraints in an unnecessarily tight manner—as Cascella alleges—is expressly prohibited by BOP policy and thus not discretionary.[82] The Court, therefore, is not precluded by the discretionary function exception from adjudicating Cascella's leg-restraint claim.

Despite having jurisdiction to consider this claim, it nonetheless fails on the merits. Under Pennsylvania law, to establish the tort of negligence, a plaintiff must show that "the defendant owed a duty of care to the plaintiff, that duty was breached, the breach resulted in the plaintiff's injury, and the plaintiff suffered an

---

[80]   28 C.F.R. § 552.22(h)(3); Doc. 163-1 at 9 (BOP Program Statement P5566.06 § 6(h)(3)).
[81]   Doc. 163-1 at 9 (BOP Program Statement P5566.06 § 6(h)(3)).
[82]   *See Berkovitz*, 486 U.S. at 536.

actual loss or damages."[83]  Due to a complete absence of evidence, Cascella has failed to adequately support the second and third elements of his negligence claim. That is, Cascella has failed to create a genuine dispute of fact as to whether Lieutenant Foura breached a duty of care owed to Cascella or whether that purported breach proximately caused Cascella's injuries.

The United States has proffered competent evidence—both testamentary and documentary—that Lieutenant Foura (and other BOP staff) performed all the requisite restraint checks on Cascella and determined that his restraints were appropriately applied and allowed for proper circulation.[84]  Although Cascella adamantly *alleges* that Foura applied the leg restraints too tightly and caused lacerations on his legs, allegations are all that Cascella has offered.  He has not identified or provided *any* competent evidence that would create a genuine dispute of fact regarding breach or causation.  For example, he has not proffered a verified complaint, declaration, affidavit, witness statement, deposition excerpt, or any other form of competent evidence that Lieutenant Foura's conduct breached a duty of care or that this purported breach proximately caused Cascella's injuries.

Instead, Cascella merely repeats or embellishes the allegations in his complaint and points to one medical record showing that—on April 2, 2020—a

---

[83]  *Kinney-Lindstrom v. Med. Care Availability & Reduction of Error Fund*, 73 A.3d 543, 563 n.17 (Pa. 2013) (quoting *Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 980 A.2d 502, 506 (Pa. 2009)).

[84]  *See* Doc. 152-21 ¶¶ 17-19, 22; Doc. 152-25 at 2; Doc. 152-26 at 2-3; Doc. 152-27 at 2-3.

medical provider observed "minor" abrasions that were healing on his legs.[85]

While that medical record may be sufficient to show damages (*i.e.*, that Cascella's

legs were injured), it does not, by itself, establish breach or proximate cause.

Again, this is not the extremely rare type of *res ipsa loquitur* case where "an

inference of negligence may be raised without direct evidence of the negligent

act,"[86] and Cascella does not argue that it is.

At summary judgment, "[t]he non-moving party cannot rest on mere

pleadings or allegations; rather it must point to actual evidence in the record on

which a jury could decide an issue of fact its way."[87]  "In this respect, summary

judgment is essentially 'put up or shut up' time for the non-moving party: the non-

moving party must rebut the motion with facts in the record and cannot rest solely

on assertions made in the pleadings, legal memoranda, or oral argument."[88]

Cascella's response to Defendant's motion for summary judgment displays a

glaring lack of evidence for at least two elements of his final negligence claim.  No

reasonable juror could find in Cascella's favor because he has failed to adduce any

---

[85]  *See* Doc. 162 at 15; Doc. 152-30 at 3.  The Court observes that, in Cascella's documentary submissions, this April 2, 2020 medical encounter note appears to be modified with several handwritten notations by Cascella.  *See* Doc. 162-8 at 3-4.

[86]  *Toogood*, 824 A.2d at 1146.  Three conditions must exist for the doctrine of *res ipsa loquitur* to apply: "(1) the injury must be of a type not ordinarily occurring absent negligence; (2) the defendant must have had exclusive control of the instrumentality effecting the injury; and (3) the plaintiff must not have contributed to the injury."  *Id.*  These elements are plainly not present in the case at bar, nor does Cascella argue that they are.

[87]  *El v. SEPTA*, 479 F.3d 232, 238 (3d Cir. 2007).

[88]  *Id.* (quoting *Colkitt*, 455 F.3d at 201).

evidence of breach or causation as required by Pennsylvania law.  Therefore, the Court is constrained to grant summary judgment in Defendant's favor on Cascella's final FTCA claim.

## IV.    CONCLUSION

Based on the foregoing, the Court will dismiss Cascella's first two FTCA claims for lack of subject matter jurisdiction and grant Defendant's motion for summary judgment as to his third.  An appropriate Order follows.


BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge